# United States Court of Appeals
## For the First Circuit

No. 99-1919

THOMAS R. RICCI, ETC.,

Plaintiff, Appellant,

v.

ALTERNATIVE ENERGY INC., BEAVER PLANT OPERATIONS, INC.,
ZURN EPC SERVICES, INC., AND ZURN INDUSTRIES, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Circuit Judge,
Bownes, Senior Circuit Judge, and
Lynch, Circuit Judge.

Kevin J. McAllister, with whom Brennan, Recupero, Cascione, Scungio & McAllister and E. James Hamilton were on brief, for appellant.

Daniel R. Mawhinney, with whom Michael R. Bosse and Thompson & Bowie were on brief, for appellees Zurn EPC Services, Inc. and Zurn Industries, Inc.

Phillip D. Buckley, Paul W. Chaiken, and Rudman & Winchell, LLC on brief for appellees Alternative Energy, Inc. and Beaver Plant Operations, Inc.

**LYNCH,** <u>Circuit Judge</u>.  A fall of some 80 feet from a tall biomass stack at a power plant in Livermore Falls, Maine, killed David Ricci, a young environmental worker sent to do emissions testing on the stack.  This tort action by Ricci's father, Thomas Ricci, was brought against the company whose stack was involved, Alternative Energy, Inc., and its predecessor ("the AEI defendants") and the design/build contractor of the power plant, Zurn EPC Services, Inc., and its parent corporation ("the Zurn defendants").

The primary question in this case is whether, on the materials submitted on summary judgment, a factfinder could find only that the competing inferences explaining Ricci's cause of death are equally probable, or whether the evidence would permit the factfinder to infer that one explanation, on which plaintiff's negligence claim rests, is the more probable cause of Ricci's falling to his death.  Specifically, the question is whether the inferences (for there were no witnesses to the accident) permit the conclusion that it is more likely that Ricci inadvertently fell into a ladderway opening while moving about the high platform where his work tools and gloves were

found than it is that he fell as he was about to descend the ladder. The question is important to plaintiff's negligence and other tort theories because the platform next to the ladderway opening was admittedly missing safety guards called for in the design plans. The district court found the one inference no more likely than the other and, because the plaintiff could not prevail if the inferences were evenly balanced, entered summary judgment dismissing plaintiff's claim.

On appeal, plaintiff argues that the grant of summary judgment was in error for two reasons. Only a jury, and never the judge in a jury-claimed case, can weigh the probabilities of different inferences, he says, and so it was improper to resolve this question on summary judgment. The plaintiff also urges that the inference that Ricci fell through the unguarded hole is both rational and more probable or, alternatively, that the res ipsa loquitur doctrine applies to this case, entitling plaintiff to get to the jury.[1] The plaintiff is wrong on the first point,

---

[1] The plaintiff makes another argument which may be swiftly rejected. It was premature, plaintiff says, for the trial court to consider summary judgment when it had not yet ruled on plaintiff's objections to the magistrate's order denying plaintiff the right to depose the two OSHA compliance officers who investigated Ricci's death. The Secretary of Labor had successfully moved to quash the deposition subpoenas. A party who wishes to forestall ruling on summary judgment

-3-

but we conclude that it was error for the district court to grant summary judgment for the defendants.

**I**

Our review of the entry of summary judgment is de novo, and we resolve all reasonable inferences in favor of the nonmovant in describing the undisputed material facts. See Sheehan v. Marr, No. 98-1813, 2000 WL 298565, at *3 (1st Cir. March 27, 2000).

On August 26, 1996, Ricci was sent by his employer, Eastmount Environmental, Inc. of Rhode Island, to the Livermore Falls, Maine, power plant to conduct emissions testing on the biomass smoke stack.

The stack was housed in a structure adjacent to the "precipitator." The precipitator and the stack housing were approximately one to two feet apart. Ricci was to perform his testing high up the stack, on a platform approximately four feet wide that encircled the stack. Access to the platform was from

---

because material discovery has not been taken is obliged to file an affidavit under Federal Rule of Civil Procedure 56(f). Plaintiff did not do this. In any event, plaintiff had the full OSHA file, and the magistrate's order was plainly correct. See United States ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951). Plaintiff had what he needed from the OSHA file.

-4-

a ladder attached to the stack that passed through a twenty-eight inch by thirty inch rectangular opening in the platform. The ladder was accessible from the precipitator roof via a catwalk approximately two to three feet wide that spanned the distance between the precipitator roof and the ladder. The platform was approximately seventy feet above the precipitator roof.

Ricci, who had never been to the Livermore Falls facility, arrived there at approximately 1:40 p.m. He spoke only briefly to the plant engineer. Ricci and a co-worker, Paul Lynch, were intended to work together. Lynch, however, had initially gone to the wrong plant. Discovering his mistake, Lynch then went to the Livermore Falls facility and found Ricci's body there. At approximately 3:30 p.m., Lynch notified Dale Dyer, the plant engineer, that he had found Ricci and requested rescue personnel. Ricci's body was in the narrow crevice between the precipitator and the stack housing, approximately two to three feet to the left of a point directly underneath the platform ladderway opening.

There were no eyewitnesses to Ricci's fall. Hair and tissue specimens and blood splatters were observed at a number

of locations above, on, and below the precipitator roof level, close to the base of the ladder, and near Ricci's body. Two wrenches and an apparently unused Saf-T-Climb[2] were found on the precipitator roof a few feet to the right of the catwalk that accessed the ladder. Gloves and a tool box were found on the platform. One estimate is that the gloves were approximately two to four feet from the ladderway opening. The tool box was approximately eight feet away from the ladderway opening. Another Saf-T-Climb was found attached to the center rail of the ladder, at waist height, above the platform. There is no evidence that the Saf-T-Climb was damaged or defective. There is no evidence that the Saf-T-Climb device found there was used or left by anyone other than Ricci. Rope and conduit were coiled at the base of the ladder. Ricci's safety belt was still around his waist, and attached to it was a D-ring that would be used to attach to a Saf-T-Climb. There is no evidence that Ricci's safety belt or D-ring were damaged or defective. The

---

[2] A Saf-T-Climb is a ratcheting device used to safely climb a ladder. The ratcheting mechanism attaches to a center rail on the stack ladder and moves up as one climbs but holds fast if one falls. The ratcheting mechanism is connected to nylon webbing that has a clipping hook at its end. This hook clips in to a D-ring on the climber's harness or safety belt.

weather had been relatively calm with no evidence of rain prior to the discovery of Ricci's body.

There are only five to six inches of slack in the Saf-T-Climb when it is attached to a climber on the ladder. Other climbers sometimes also use a six foot lanyard, attached to their harness or safety belt and with a clip on the end, to secure themselves before attaching to or detaching from the Saf-T-Climb when getting on or off a ladder. There is no evidence that Ricci wore such a lanyard. There was a rope attached to his harness, but it had a taped end instead of a hook or clipping device. Lynch, Ricci's coworker, stated that Ricci did not appear to have a safety lanyard on his harness when he found him. There is evidence that gloves, even when worn for climbing, are not always worn when attaching to or detaching from the Saf-T-Climb. There was testimony, the admissibility of which was unresolved, that Ricci always wore his gloves when climbing. There is evidence that some of Ricci's co-workers told OSHA that Ricci went through a ritual of putting on his gloves before ascending or descending ladders. There was also a statement from one of Ricci's supervisors that Ricci was "highly safety-conscious in his work."

The evidence suggests that if Ricci were alone and wanted to do the assigned work, at some point he would have needed to descend the ladder to get the rope and conduit found at the base of the ladder. Lynch testified that all of the necessary testing materials were not on the platform when he found Ricci's body.

Plaintiff supported his theory of how the accident happened with a report and testimony from an expert witness. Defendants did not move to strike the testimony, but objected to it in their reply to plaintiff's opposition to the motion for summary judgment. The district court did not rule on this evidentiary matter, however.[3]

**II**

A. <u>Res Ipsa Loquitur</u>

Under Maine law, application of the res ipsa loquitur doctrine may affect plaintiff's burden of proof. <u>See</u> <u>Sheltra</u> v.

---

[3]  Defendants also argue to this court that the evidence of Ricci's always wearing his gloves is inadmissible. They claimed before the district court that this evidence was inadmissible. The district court made no ruling on this question. As with the issue of the admissibility of plaintiff's expert's testimony, we leave this question to the district court.

Rochefort, 667 A.2d 868, 870 (Me. 1995). Thus, we turn to that contention first.

We recently described the doctrine in Varano v. Jabar, 197 F.3d 1 (1st Cir. 1999):

> Under Maine law, the res ipsa loquitur doctrine permits a finding of negligence in connection with an unexplained event if the plaintiff can show (1) the event was of a kind which ordinarily does not occur in the absence of negligence; (2) other responsible causes are sufficiently eliminated by the evidence; and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff. See Poulin v Aquaboggan Waterslide, 567 A.2d 925, 926 (Me. 1989); Ginn v. Penobscot Co., 334 A.2d 874, 878, 880 (Me. 1975). According to the Restatement (Second) of Torts, 'It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.' Section 328D(2) (1965).

Id. at 5. As in Jabar, there are reasonable alternative explanations for the proximate cause of Ricci's accident, and so the res ipsa doctrine does not, on this evidence, apply. See Wellington Assocs., Inc. v. Capital Fire Protection Co., 594 A.2d 1089, 1092 (Me. 1991).

B. Sufficient Evidence to Prove Causation

1. Role of Judge and Jury

Plaintiff argues that a judge, on summary judgment, may not "make assessments of factual possibilities and probabilities" and uses that premise to attack the court's ruling that "[i]f the probabilities are evenly matched, the Plaintiff[] cannot prevail." Plaintiff's argument confuses the question of the proper role of the judge on summary judgment with the question of plaintiff's burden of proof.

It is the role of the judge on summary judgment to determine whether a particular inference is reasonable. See Mullin v. Raytheon Co., 164 F.3d 696, 698 (1st Cir. 1999); Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). Evidence presented on summary judgment may be "inherently incredible" and so disregarded. Greenburg, 835 F.2d at 936. Judgment about whether an inference is reasonable is different from a "judge superimpos[ing] his own ideas of probability and likelihood (no matter how reasonable those ideas may be)." Id. In fact, for negligence cases, the Restatement (Second) of Torts, which is frequently cited with approval by the Maine Supreme Judicial Court, see, e.g., Walter v. Wal-Mart Stores, Inc., No. 99-364, 2000 WL 371164, at ¶27-¶28 (Me. March 12, 2000); Kaechele v. Kenyon Oil Co., No. 99-280, 2000 WL

-10-

225891, at *3 n.5 (Me. Feb. 29, 2000); <u>Bryan R.</u> v. <u>Watchtower</u>
<u>Bible and Tract Soc'y</u>, 738 A.2d 839, 844-45 (Me. 1999); <u>Collomy</u>
v. <u>School Admin. Dist. No. 55</u>, 710 A.2d 893, 895-96 (Me. 1998),
provides:

> It is the function of the court to determine . . .
> whether the evidence as to the facts makes an issue
> upon which the jury may reasonably differ as to
> whether the conduct of the defendant has been a
> substantial factor in causing the harm to the
> plaintiff . . . .

Restatement (Second) of Torts § 434(1)(a). The trial judge acts
well within his authority, then, in assessing the reasonableness
of the inferences that might be drawn from circumstantial
evidence.

The trial court stated that the plaintiff could not
prevail if the only conclusion that could reasonably be drawn
was that the probabilities of plaintiff's and defendants'
competing theories as to what caused Ricci's fall were evenly
matched. The trial court's statement was accurate. "A mere
possibility of such causation is not enough; and when the matter
remains one of pure speculation and conjecture, <u>or the</u>
<u>probabilities are at best evenly balanced</u>, it becomes the duty
of the court to direct a verdict for the defendant."

-11-

Restatement (Second) of Torts § 433B cmt. a (emphasis added); accord Champagne v. Mid-Maine Med. Ctr., 711 A.2d 842, 845 (Me. 1998) (stating that a tort plaintiff must establish causation to avoid summary judgment and that "judgment as a matter of law in a defendant's favor is proper when any jury verdict for the plaintiff would be based on conjecture or speculation"); Unobskey v. Continental Ins. Co., 147 Me. 249, 257-58 (Me. 1952) ("Conjecture [and] choice of possibilities . . . [are] not proof.  There [must be] something more to lead a reasoning mind to one conclusion rather than to the other.") (internal quotation marks omitted) (second alteration in original).  Given that the burden of proof is on a plaintiff to show that it was more likely than not that the defendant's negligence caused the harm, the trial judge's method of analysis was appropriate. Cf. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (explaining that summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

2. Inferences from Circumstantial Evidence

Under Maine law on the tort of negligence, a plaintiff must show "(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) that the breach was the actual and legal cause of plaintiff's injury." Hayes v. Larsen's Mfg. Co., 871 F. Supp. 56, 58 (D. Me. 1994) (internal quotation marks omitted). This appeal concerns only the third element; the viability of plaintiff's case on the first two elements has not been tested.

As plaintiff says, "[i]n order to establish proximate cause, Plaintiff[] [has] to prove that David Ricci either fell through[] or inadvertently stepped through the ladderway opening." Defendants agree.[4] Plaintiff urges he has done so through circumstantial evidence. Under Maine law, proximate cause may be established entirely through circumstantial evidence. "A plaintiff may under many circumstances be completely unable to remember or recount or explain an accident, but may nevertheless recover if the deficiency is met by other reliable evidence. Such evidence may be direct or circumstantial. It may come from . . . known physical facts.

_____

[4] Defendants have not argued that they are entitled to summary judgment on other grounds even if plaintiff could make this showing.

-13-

It may raise reasonable inferences which satisfy the burden of proof."  Thompson v. Frankus, 115 A.2d 718, 720 (Me. 1955).

Defendants make a general argument that the cause of the accident must be speculative because there were no witnesses to it.  Yet tort law often encounters situations in which there are no witnesses and no direct evidence as to the cause of an event that results in harm.  Fire cases are one example.  "By the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony."  Minerals & Chems. Philipp Corp. v. S.S. Nat'l Trader, 445 F.2d 831, 832 (2d. Cir. 1971).  In criminal prosecutions, as well, circumstantial evidence can sustain a conviction.  See Commonwealth v. Webster, 59 Mass. 295 (1850), available in 1850 WL 2988, at *11-*17 (describing the use of circumstantial evidence in proving criminal acts and noting that "[i]t would be injurious to the best interests of society, if [circumstantial evidence] could not avail in judicial proceedings").

The defendants are right in one sense: where there is no direct evidence, there may well be cases where the inferences as to causation are simply too speculative to permit the case to

-14-

survive summary judgment. The real question, then, becomes whether the evidence would permit a jury reasonably to find that plaintiff's theory of how Ricci fell is more probable than defendants' theory. The district court's conclusion that the evidence would not permit such a finding was certainly reasonable; nonetheless, our review on summary judgment is de novo and not deferential. Considering the circumstantial evidence, we disagree with the well-respected trial judge that a jury could not reasonably find plaintiff's explanation more probable than defendants'. While close, this is a case in which different people, drawing on their life experiences, could reasonably reach different conclusions.

A jury could easily find that Ricci wore his gloves and climbed the ladder up to the platform with the Saf-T-Climb device engaged, arrived at the platform, took his gloves off and disconnected from the Saf-T-Climb, and stood or walked on the platform. The Saf-T-Climb device was found at waist level above the platform, and Ricci's gloves and tool box were on the platform. Ricci's tool box was approximately eight feet away from the ladder, strongly suggesting that Ricci had to be disconnected from his Saf-T-Climb and away from the ladder to

put it there.  Thus, a jury could reasonable infer that he did not fall from the ladder before accessing the platform.  This was also the conclusion reached by Dale Dyer, the plant employee who shared responsibility for administering safety programs. Dyer observed and took photographs of Ricci's body and the accident scene immediately after the body was discovered.  A jury could also easily infer from the location of Ricci's body that he fell from either the platform opening or the ladder and that he did not fall over the platform's perimeter guardrail.

It is reasonable to infer that Ricci would have worn his gloves and used his Saf-T-Climb, which he had worn and used on his way up, when climbing down the stack ladder.  A jury could reasonably infer, therefore, that Ricci did not fall from a point below the ladderway opening while descending the stack ladder (another of defendants' theories), because he had on neither his gloves nor his Saf-T-Climb.

The most reasonable competing inferences, which the trial judge identified, were that Ricci fell or stepped into the ladderway opening inadvertently (perhaps for lack of a chain guard) or that Ricci had positioned himself over or near the ladderway opening as he was about to descend the ladder and fell

before he was able to engage his Saf-T-Climb.  We agree that those are the two most probable inferences.  The judge held that neither inference was more probable than the other and that any jury finding would, therefore, be based only on sheer speculation.  We disagree and explain why we think a jury could rationally conclude that the first scenario was the more likely.

Both sides have working for them the fact that the ladderway opening was a special danger.  Defendants suggest that it is easy to infer that Ricci lost his footing while straddling the hole or attempting to mount the ladder.  In response, plaintiff urges that Ricci would have been particularly careful in the face of such a danger, making an inadvertent fall while accessing the ladder unlikely.

It is reasonable to view the evidence as disfavoring the explanation that Ricci had stepped onto the ladder in order to descend.  Considering the purpose of the Saf-T-Climb, a jury could conclude that it would not make sense for Ricci to have gotten on the ladder before attaching to the Saf-T-Climb. Further, the normal procedures called for Ricci to attach himself to the Saf-T-Climb before getting on the ladder.  This

discounts the likelihood of defendants' argument that Ricci fell while standing on the ladder itself.

Further, if Ricci had straddled or leaned over the ladderway opening to connect to the Saf-T-Climb, it is reasonable to infer that he would have been highly conscious of his precarious position and that, had he slipped, he could and would have grasped something to prevent falling through.

The location of Ricci's gloves is also significant with regard to the theory that Ricci fell while getting on the ladder. That Ricci would have worn gloves down the ladder is a logical inference from his having worn the gloves up.[5] His gloves were neither in his pocket, nor were they right next to the opening, as might be expected from someone preparing to go down. The employee who ultimately brought the gloves down testified that they were probably "two feet, three feet" from the ladderway opening and that the tool box was perhaps eight feet away. A photograph of the scene indicates that the gloves were about three to three and a half feet from the edge of the opening. There were only five to six inches of slack in the

_____

[5] The inference would be buttressed by the evidence, previously described, of Ricci's safety consciousness and his practice of always wearing his gloves, if admissible.

Saf-T-Climb when a climber was attached to it.  A jury could infer that these distances meant the gloves would have been barely reachable, or not reachable, by a person attached to the Saf-T-Climb.  A jury could conclude that if Ricci had been about to descend, he would have put his gloves in his pocket or moved them closer to the ladderway opening instead of leaving them where they were found.  This supports the inference that Ricci was not leaning over or straddling the ladderway opening in order to attach to his Saf-T-Climb when he fell.[6]  Accordingly, a jury could reasonably conclude that the most likely cause of Ricci's fall was his inadvertently stepping into the ladderway opening while moving about the platform.

These reasonable inferences are sufficient, though barely so, to permit a jury to find that plaintiff's explanation is more probable than defendants'.  Entry of summary judgment was error.  We reach this conclusion without considering plaintiff's expert's opinion as to how the accident occurred.

---

[6]    The trial judge pointed to defendants' statement that there was evidence that the gloves could be reached by a person on the ladder.  But that evidence was a statement by the person who retrieved the gloves that he could do so without detaching from his lanyard; he could not recall where he was standing when he retrieved the gloves. The lanyard gave an extra five or six feet of slack not available to Ricci.

It is true that plaintiff's expert testified that it was more probable than not that Ricci had inadvertently fallen through the ladderway opening.  The reasons given by the expert were largely those summarized above.  We need not decide whether any separate weight should be given to the expert's testimony in this case, a case in which different peoples' views may depend on their individual practical experiences and notions of common sense.[7]

Our opinion is based only upon the record evidence on summary judgment.  The evidence may develop differently at trial, and, if so, our conclusion does not foreclose the possibility of a directed verdict.

C. Dismissal of Other Claims

---

[7]    Cf. Bieghler v. Kleppe, 633 F.2d 531, 533-34 (9th Cir. 1980) (stating that where there were no witnesses to an accident, entry of summary judgment was error in face of affidavit from accident reconstruction expert, even though affidavit did not describe in detail how conclusions were reached).  Under Federal Rule of Evidence 703, an expert may base his opinion on facts or data not admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field."  See also United States v. Corey, No. 98-1893, 2000 WL 298583, at *4 (1st Cir. March 28, 2000).  Here, the expert relied on statements from Ricci's father and co-workers to the effect that it was Ricci's practice to wear gloves while climbing and that he was careful. Even if that evidence were not admissible, there is no indication it is of a type not relied on by experts in the field.

Plaintiff also complains about (a) dismissal of the failure to warn and failure to train claims set forth in Counts III and IV and (b) entry of summary judgment on the strict products liability claim against the Zurn defendants set forth in Counts IX and X.

As to the failure to train and to warn, the trial court found that plaintiff "ha[d] not seriously pressed an argument that some breach of those duties caused the accident in question." The argument has been waived and is not open to plaintiff on remand.

The dismissal of the strict liability claims followed from dismissal of the negligence claim on proximate causation, and that ground is no longer available. The Zurn defendants argue that summary judgment is warranted nonetheless, because the biomass factory is not a "product" under Maine law for purposes of this claim. The district judge did not address this argument, and we think it better to permit that to happen on remand.

D. <u>Choice of Law As To Remedy</u>

Plaintiff claims that the district court erred in ruling that Maine's wrongful death statute and Maine's law on

-21-

comparative negligence and damages apply to this case. We disagree. Plaintiff acknowledges that Maine's choice of law rules govern this diversity action. Maine applies the provisions of the Restatement (Second) of Conflict of Laws to choice of law determinations in tort cases. See Adams v. Rubin, 964 F. Supp. 507, 509 (D. Me. 1997).

The Restatement provides as a general principle that "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which . . . has the most significant relationship to the ocurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1). In applying this general principle, courts are to inquire into: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Id. § 145(2). The comments to § 145 further note that "subject only to rare exceptions, the local law of the state where conduct and

injury occurred will be applied." Id. § 145 cmt. d.[8] Given that Ricci's accident occurred at the AEI defendants' power plant in Maine, that the negligent conduct alleged (inadequate safety chains or rails around the ladderway opening) occurred in Maine, and that the contract for Ricci's services was entered into in Maine, it is Maine law that applies to this case.

More significantly, the Restatement is fairly clear with regard to choice of law questions in negligence actions. Generally, the local law of the state where the injury occurred applies. See id. § 146. The same holds true for statutory wrongful death actions. See id. § 175. As with the general principle for torts, in negligence actions in which the injury and conduct occurred in the same state, that state's laws "will usually be applied." Id. § 146 cmt. d.[9]

---

[8] As an example of a rare exception, the Restatement suggests cases in which "all interested persons" are domiciled in a state other than the state in which the conduct and injury occurred. See Restatement (Second) of Conflict of Laws § 145 cmt. d.

[9] As with the general principle, the Restatement suggests that there may be exceptions to this rule. The examples given, however, are nothing like the present case. See Restatement (Second) of Conflict of Laws § 146 cmt. d (describing a negligence action arising from mid-air conduct and injury over state Y where all other relevant contacts for both parties are with state X).

The relative clarity of the relevant Restatement sections notwithstanding, plaintiff argues that Rhode Island has the most significant interest with respect to damages, the wrongful death statue, and contributory negligence because Ricci resided in Rhode Island and the loss caused by his death will be most felt there. Plaintiff relies on <u>Collins</u> v. <u>Trius, Inc.</u>, 663 A.2d 570 (Me. 1995), for this proposition. <u>Collins</u> involved a bus accident in Maine. The Maine Supreme Judicial Court ruled that Canadian law on damages applied in the case because the bus company and bus driver were Canadian, the passengers were Canadian, the passengers had purchased their tickets in Canada, and the trip originated and was to conclude in Canada. <u>See</u> <u>id.</u> at 572-73.

Those facts are far different from the facts in the present case, in which the only connection to Rhode Island is that Ricci resided there. This is simply not enough to overcome Maine's relationship to and interest in this tort action. The decision of the district court on choice of law was clearly correct.

**III**

The decision of the district court awarding summary judgment to the defendants is <u>reversed</u> and the case is remanded for proceedings consistent with this opinion.