Bone v. Hadco Corp., et al.          CV-00-293-JD  10/23/01
                UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF NEW HAMPSHIRE


Elston Bone

        v.                              Civil No. 00-293-JD
                                        Opinion No. 2001 DNH 195
Hadco Corp., Sanmina Corp.,
and Bruce Paquette


                          O R D E R


        The plaintiff, Elston Bone, proceeding pro se, brings an

action against his former employer, Hadco Corporation, and its

parent, Sanmina Corporation, alleging discrimination in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §

2000e, et seq.[1]  Bone contends that he was subjected to

discrimination and harassment based on race and retaliation for a

previously filed discrimination complaint.  Hadco moves for

summary judgment, and Bone objects.


                       Standard of Review

        Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

_____

        [1]There appears to be no meaningful distinction between the
defendants, Hadco and Sanmina, for purposes of the motion for
summary judgment, and they will be referred to collectively as
Hadco.  The plaintiff's state law claims against Hadco and all
claims against Bruce Paquette have been dismissed.  See Orders
dated May 10, 2001, May 29, 2001, June 6, 2001.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A material fact is one that "has the potential to change the outcome of the suit under the governing law" and a factual dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." Grant's Dairy--Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999).

A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000). When the party with the burden of proof opposes summary judgment, he or she cannot rely on speculation or conjecture and instead must present sufficient evidence on essential factual elements of each claim to generate

a trialworthy issue.  See In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001).  An absence of evidence on a material issue weighs against the party who would bear the burden of proof at trial on that issue.  See Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).

The Record for Summary Judgment

Hadco protests that Bone's objection to summary judgment lacks a factual statement as required by Local Rule 7.2(b)(2).  Although it is brief, Bone's objection does include a factual statement at pages four and five.  In addition, Bone, who is proceeding pro se, has provided citations to the record to support additional factual statements in his objection.  To the extent Bone failed to counter properly supported material facts in Hadco's memorandum, however, those facts are deemed admitted.  See id.

Hadco objects to much of the documentary evidence submitted by Bone in support of his objection to summary judgment.  Hadco's objection to the audio-taped depositions of James Lewis, Patricia Fisher, and Robert Kosciusko has been resolved by the court's order of September 5, 2001, denying Bone's motion to waive Federal Rules of Civil Procedure 32(c) and 26(a)(3)(B).  With respect to the affidavit of Rachel Bone, who is the plaintiff's

3

wife, Hadco contends that several statements in her affidavit are not based on her personal knowledge.

To be competent for purposes of opposing a motion for summary judgment, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  "[P]ersonal knowledge is the touchstone" for an analysis under Rule 56(e).  Perez, 247 F.3d at 315.  Conclusions, speculation, and assumptions are not competent for purposes of summary judgment.  See id.

Four of the challenged statements, numbered four through seven in the affidavit, begin by stating, "Elston had informed me . . . ."  As such, the challenged statements are not based on Mrs. Bone's personal knowledge, but instead merely repeat information conveyed to her by her husband.  Therefore the challenged statements do not comply with Rule 56(e) and will not be considered in opposition to summary judgment.

Hadco also contests Mrs. Bone's statement in paragraph nine of her affidavit about her visits with the plaintiff during breaks because it is inconsistent with her prior deposition testimony.  See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 5 (1st Cir. 1994).  To avoid a direct conflict, her

4

statement is interpreted to be consistent with her deposition testimony that she saw the plaintiff punch for break only once.

Hadco also objects to exhibits included in Bone's appendix submitted in support of his objection to summary judgment. In particular, Hadco objects that Bone's complaints against Bruce Paquette, his letter to Robert Kosciusko, Bone's 1999 complaint to the Equal Employment Opportunity Commission, and Hadco's response are not authenticated and most are not referenced in Bone's memorandum.[2] Exhibits that are not referenced in Bone's opposition to summary judgment will not be considered for that purpose.

Evidence that is inadmissible at trial, such as hearsay and unauthenticated documents, is not to be considered as part of the record for summary judgment. See Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998). To the extent Bone relies on the truth of matters presented in his complaints about Bruce Paquette, the letter to Kosciusko, and Hadco's response to his 1999 complaint, the evidence would be inadmissible hearsay, which does not comply with Rule 56(e). In addition, since the documents are not authenticated, they cannot otherwise be used in

---

[2]The 1999 EEOC complaint was not included in Bone's materials submitted to the court in support of his opposition to summary judgment.

5

support of Bone's opposition to summary judgment. See Carmona v. Toledo, 215 F.3d 124, 131-32 (1st Cir. 2000). As Hadco does not object to the challenged materials as evidence that complaints were filed, the materials will be considered for that purpose only.

Hadco says that copies of documents involving unrelated personnel incidents at Hadco were subject to the confidentiality stipulation between the parties and should not have been submitted since they are not referenced in Bone's objection. Although Bone refers to materials received in discovery about Bruce Paquette, Bone does not cite any specific document or develop any argument based on those materials. Since the personnel materials included in Bone's appendix are subject to the confidentiality stipulation and are not cited in support of his objection to summary judgment, the materials will be removed from the appendix and returned to him. Bone is cautioned to comply with the confidentiality stipulation in the future.

Neither Hadco nor Bone has suggested that information essential to the present motion and objection to summary judgment is unavailable due to the parties' ongoing discovery disputes. See Fed. R. Civ. P. 56(f); Ricci v. Alternative Energy Inc., 211 F.3d 157, 159 n.1 (1st Cir. 2000).

## Background

Elston Bone, who is African American, worked at Hadco from March of 1996 until June of 1999. While working at the Hadco Derry facility, Bone filed a charge of discrimination with the New Hampshire Commission for Human Rights on May 1, 1998, alleging discrimination on the basis of race. On June 25, 1999, the Commission notified Hadco that it found no probable cause in support of Bone's complaint, and his appeal was denied in August of 1999.

In the meantime, Bone was transferred to the Hadco facility in Hudson, New Hampshire, in December of 1998. Initially, Richard Mancini was Bone's supervisor at the Hudson facility in the develop, etch, and strip ("DES") department. Mancini warned Bone and put him on probation for six months because he was late to work three times in a thirty-day period. Mancini was later transferred, and Bruce Paquette and Tim Beliveau became Bone's supervisors in March of 1999.

Bone previously had worked under Paquette when Bone chose to work overtime shifts in Paquette's department. At that time, they had a decent relationship, and Bone had a neutral or even favorable opinion toward Paquette. Bone had no reason to believe that Paquette disliked him.

Paquette states in his affidavit that when he became a

supervisor in the DES department, where Bone worked, he found that some of the employees were abusing their break time and that the department lacked discipline. He also found that the three members of the third production line, Bone, Charlie Roy, and Tony Ferreira, had personality conflicts that affected their productivity. As a result, Paquette concentrated on improving that line's production.

Hadco's policy permitted three ten-minute breaks and twenty minutes for lunch. Before Paquette became supervisor, the break times were not strictly enforced, and the employees worked out their break times by agreement. Bone and Roy commonly spent their breaks and lunch times in an adjacent Hadco building, the AOI building. Bone visited his fiancee who worked in the AOI building during his breaks.

When Paquette became supervisor, he began to enforce the break times specified by policy. He required employees who left the DES building for breaks, as both Bone and Roy did, to punch out and back in for each break. Bone and Roy disagreed about when each would take his breaks.

On April 7, 1999, Paquette met with Bone and Roy about their dispute over break times. When they could not agree, Paquette resolved the matter by giving each of them their first choice as to a time to take two of the four breaks allowed during a twelve-

8

hour shift. Bone was not satisfied with the result and refused to change any of his times to accommodate Roy because he wanted to maintain the same break times as his finacee. Bone remembers that Paquette remarked to him that he had heard that he spent his breaks with his fiancee and told him that he should wait to see her after work. Bone states that Paquette told him he could cut his break time down so that he would not have time to visit his fiancee.

Paquette gave Bone a warning for taking an extended break on April 8. On May 3, Paquette met with Bone to review his time sheets, which showed that he punched out for breaks on two occasions and did not punch back in. Bone asserted that Paquette was harassing him. Paquette states in his affidavit that a meeting was held with Bone, himself, Patricia Fisher from Hadco's Human Resources Department, and Senior Production Manager Paul Morin to discuss Bone's charge. Paquette states that Morin explained to Bone that the rule about punching out and in for breaks applied to employees in his position and that Paquette was entitled to enforce the rule.

On May 6, 1999, two of Bone's co-employees complained that Bone had taken an extended lunch break. Paquette asked Fisher to investigate the complaints. Paquette issued a warning to Bone for returning late from lunch. On May 11, 1999, Bone's other

9

supervisor, Tim Beliveau, gave Bone a warning for using abusive language to a fellow employee.

At Bone's request, a meeting was held on May 18, 1999, with Bone, James Lewis, the Human Resources Manager, Paquette, and Fisher to discuss the warnings Bone had received. Lewis determined that the warnings issued by Paquette on April 8 and May 6 should have been tardy notices, rather than warnings, and a warning should have been issued only after three tardies within a thirty-day period. Lewis also decided that Hudson employees would not be required to punch out and back in for breaks if they only moved between the Hadco buildings. Lewis advised Bone, however, that his supervisors could require him to punch out and in when he left the DES building for breaks because of his practice of being late.

Lewis removed the warnings issued by Paquette from Bone's file after the meeting. Lewis did not remove the warning for abusive language issued by Beliveau on May 11. Because Bone was on a six-month probation due to the warning for being late three times in January, he was on double probation after the May 11 abusive language warning. Bone's breaks were monitored by Paquette, Beliveau, and other supervisors. Beliveau and others documented instances where Bone extended his break times without permission. Bone's co-employees complained that he was not doing

10

his share of the work on the line.

On June 1, 1999, Paquette told all three employees on Bone's line to take their breaks at 5:00 p.m. in order to attend a meeting at 5:10 p.m. Bone did not take his break at 5:00, as directed, even though his line was shut down at that time, and began his break late. When Bone did not arrive for the meeting at 5:10 or respond to pages, Paquette went to look for him. Paquette found Bone sitting outside the DES building and said to him, "Get your butt in here." A supervisor from the AOI building who watched the exchange told Bone that he could be found insubordinate if he did not attend the meeting as he had been told to do. After taking time to calm down, Bone went into the meeting where he angrily told Paquette that he was out of line.

Paquette reported to Fisher that Bone had been insubordinate in failing to take his break and attend the meeting as directed. Fisher suspended Bone with pay on June 1, 1999, and began to investigate the charge of insubordination. On June 2, Bone submitted a document titled "Formal Complaint of Harassment against Bruce Paquette" to Fisher with a copy to James Lewis. A meeting was held on June 3 with Robert Kosciusko, Vice President of Human Resources, at Bone's request. James Lewis and Patricia Fisher also attended the meeting. Bone told Kosciusko that he felt Paquette was not treating him fairly and in particular that

11

he did not like Paquette's handling of break times.  Kosciusko then met with Paquette and discussed Bone's performance and the issues he raised.

Hadco terminated Bone's employment on June 8, 1999.  Bone filed a complaint with the Equal Employment Opportunity Commission on November 3, 1999.  In April of 2000, Bone received a right to sue letter and filed the present action.

## Discussion

Bone contends that Hadco's actions were racially discriminatory.  He brings claims that Hadco created a hostile work environment and terminated his employment in violation of Title VII.  He also contends that Hadco retaliated against him because of the complaint he filed in 1998 with the New Hampshire Commission on Human Rights.  Hadco moves for summary judgment, contending that Bone cannot prove that he was subjected to discrimination based on his race or that Hadco retaliated against him because of the 1998 complaint.

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

12

national origin.'" <u>White v. N.H. Dep't of Corrections</u>, 221 F.3d 254, 259 (1st Cir. 2000) (quoting 42 U.S.C.A. § 2000e-2(a)(1)). Unlawful employment discrimination may take the form of tangible discriminatory action or a hostile work environment. <u>See</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). If employment discrimination is perpetrated by a supervisor, "the employer is liable unless it proves the affirmative defense 'that the employer exercised reasonable care to prevent and correct promptly any [unlawful] harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise.'" <u>White</u>, 221 F.3d at 261 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998)).

A. <u>Harassment and Hostile Work Environment</u>

Bone contends that he was harassed and worked in a hostile environment at Hadco because of his race. Bone primarily focuses on Paquette's conduct, but also argues that Fisher and Morin approved or encouraged Paquette's actions. Hadco asserts that Bone cannot show a race-based hostile work environment.

To succeed on a hostile work environment claim based on race, a plaintiff must show that (1) he is a member of a protected racial class, (2) he was subjected to unwelcome

13

harassment, (3) the harassment was based on his race, (4) the harassment was sufficiently severe to be actionable, and (5) the harassment was both objectively and subjectively offensive. <u>See O'Rourke v. City of Providence</u>, 235 F.3d 713, 728 (1st Cir. 2001); <u>see also</u> <u>Landrau-Romero v. Banco Popular De P.R.</u>, 212 F.3d 607, 613-14 (1st Cir. 2000). Whether the harassment was sufficiently severe to be actionable depends on an assessment of all of the circumstances including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Id.</u> at 613 (quoting <u>Harris</u>, 510 U.S. at 23).

In this case, Bone argues that Paquette's handling of Bone's break time disputes with his fellow employee, his heightened scrutiny of Bone's adherence to break times, his concern about with whom Bone spent his breaks, his improper issuance of warnings for late breaks, and the punch out and in requirements constituted discrimination based on race. Bone does not allege and offers no evidence of any overt actions or statements by anyone that were even suggestively racial. Instead, Bone interpreted Paquette's actions as an effort to keep Bone from meeting his fiancee at break times, because Bone is black and his fiancee is white.

14

Even taking the facts in the light most favorable to Bone's position, the record does not support his claim that Paquette was motivated by racial animus.  If Paquette were aware that Bone's fiancee was white, which is not documented in the record, there is no direct evidence that he found that to be objectionable or that his supervision of Bone's break times was an effort to keep them apart.[3]  Instead, the record documents that Bone repeatedly abused the break schedule which Paquette, as his supervisor, was obligated to enforce.

Although Bone alleges that others in the department were permitted longer breaks than he was, he has provided no record support for that allegation.  The record also shows that Paquette was not alone in his concern about Bone's abuse of break time since Bone's other supervisor, Tim Beliveau, and his fellow employees noted that he extended his breaks.  In his deposition, Bone also stated that he had heard that he was blamed by other

_____

[3]Paquette's remarks to Bone that he did not need to spend break time with his fiancee since he would see her after work are not direct evidence of discriminatory animus.  Even if he said that he would reduce Bone's break times so that he would not have time to visit his fiancee, which seems to be Bone's interpretation of Paquette's intent rather than Paquette's actual words, that is not direct evidence of discrimination.  Instead, to the extent the remarks can be interpreted to be discriminatory in any way, it must be assumed that Paquette knew that Bone's fiancee was white and that he objected to Bone spending time with her because of racial issues rather than because Bone was repeatedly taking too much time for his breaks.

15

employees who were all being required to adhere to the strict break schedule because of Bone.

In addition, the incidents that Bone cites, Paquette's heightened scrutiny about the time he took for breaks and the two warnings were not sufficiently severe or abusive to constitute actionable harassment. See, e.g., Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st Cir. 1999). These incidents occurred over a period of less than two months and did not involve the kind of pervasive, threatening, or humiliating conduct that would be actionable under Title VII. See Harris, 510 U.S. at 23. Hadco supervisors responded promptly to Bone's complaints, corrected the two improper warnings issued by Paquette, and warned Bone of the consequences if he continued to abuse his break time. The record indicates that Bone chose to proceed on his own schedule rather than follow the rules, and as a result, he was more closely scrutinized and was subjected to additional restrictions, such as punching out and in for break times.

Based on the summary judgment record, Bone has failed to show a trialworthy issue as to whether Hadco created or permitted a race-based hostile work environment. Therefore, Hadco is entitled to summary judgment on Bone's Title VII claim that

16

alleges racial harassment and a racially hostile work environment.

B.  Discharge

Bone contends that Hadco's decision to terminate his employment was discriminatory.  When there is no direct evidence of discrimination, the court applies the burden-shifting analysis in which "the plaintiff 'must carry the initial burden . . . of establishing a prima facie case of . . . discrimination."[4] Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  A prima facie case of employment discrimination consists of evidence that:  (1) the plaintiff is a member of a protected class; (2) he was qualified for and was performing his job at a level that met his employer's legitimate expectations; (3) his employer took an adverse employment action against him; and (4) the employer replaced him with someone with similar skills and qualifications.  See Feliciano de la Cruz v. El Conquistador Resort, 218 F.3d 1, 5 (1st Cir. 2000); Thomas v. Eastman Kodak Co., 183 F.3d 38, 55-56 (1st Cir. 1999).  The prima

_____

[4]Absent direct evidence of discriminatory animus, no issue arises as to whether the employer was acting with a mixed motive. See Kirk v. Hitchcock Clinic, 261 F.3d 75, 78-79 (1st Cir. 2001).

17

facie case gives rise to an inference of discrimination.  See
Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54
(1st Cir. 2000).

If the plaintiff carries the modest burden of making a prima
facie case, the burden of production shifts to the employer to
counter the discriminatory inference by articulating a
legitimate, non-discriminatory reason for the termination.  See
Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st
Cir. 1999).  The employer must demonstrate through admissible
evidence that it had reasons for taking the action it did and
that if those reasons were believed, the employer did not
unlawfully discriminate against the employee.  See Feliciano, 218
F.3d at 5-6.  At the next step, if the employer demonstrates an
appropriate reason for its actions, the plaintiff must produce
evidence to prove that the employer's stated reason is a pretext
and that the true reason for the employer's decision was
discriminatory.  See Thomas, 183 F.3d at 56.

In this case, Bone has not carried the initial burden of
establishing a prima facie case.  Although he is a member of a
protected class and suffered an adverse employment decision, he
has not shown that he met Hadco's legitimate performance
expectations or that he was replaced by an employee who is not
African American, or more specifically, who is not involved in an

18

interracial relationship.

In addition, even if Bone could make a prima facie case, Hadco had a reason to terminate him, and Bone cannot show that the real reason was discriminatory. Hadco asserts, based on the affidavits of Paquette, Lewis, and Fisher, that it had a legitimate, non-discriminatory reason for discharging Bone, which was insubordination based on Bone's failure to take his break at 5 p.m and attend the meeting at 5:10 p.m. as he was directed to do by Paquette.

"Once the employer offers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason proffered was 'a coverup' for a 'discriminatory decision.'" Feliciano, 218 F.3d at 6 (quoting McDonnell Douglas, 411 U.S. at 805). Bone, therefore, must make a substantial showing that Hadco's reason, insubordination, was false or he must prove that Hadco discriminated against him based on his race. See Williams v. Raytheon, 220 F.3d 16, 19 (1st Cir. 2000).

Bone has not made any showing that Hadco's insubordination reason was false. Although Bone argues that the break policy was enforced more strictly against him, including the punch out and in requirement, he does not provide record evidence to undermine Hadco's evidence that he abused his break times and failed to follow procedures, which caused increased scrutiny of his

19

activities.  Bone disputes that his actions on June 1 constituted insubordination, because he contends he was acting as he was instructed by Paquette.  Despite Bone's view of events, the record supports Hadco's interpretation of his actions that he was told to take a break at 5 and to attend a meeting at 5:10, and instead he took his break later and did not appear for the meeting until he was found and summoned by Paquette.  Although he attempts to justify his actions, Bone does not dispute the events that led to the insubordination charge.

In addition, Hadco points to the fact that Bone was on double probation at the time of the June 1 insubordination event.  The warning for being late three times in January of 1999 and the warning in May, for using abusive language, each included a statement that any further infraction will result in disciplinary action up to and including termination.  Bone does not dispute that insubordination was a further infraction.

As noted above, Bone offers no evidence that would permit a reasonable jury to conclude that Hadco intentionally discriminated against him based on his race.  See Williams, 220 F.3d at 19.  Given the absence of any overtly discriminatory remarks or actions and the lack of remarks or actions that even suggested racial bias, there is no basis in the record for a finding of racial animus.  Therefore, Hadco is entitled to

20

summary judgment on Bone's claim that he was discharged due to racial bias.

C. <u>Retaliation</u>

Bone contends that his employment was terminated in retaliation for his 1998 complaint to the New Hampshire Commission for Human Rights. Title VII makes retaliation by an employer against an employee unlawful when the employer acts "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a).

"To establish a prima facie case of retaliation in the workplace, [an employee] must demonstrate that: (1) He engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity." <u>Hernandez-Torres v. Intercontinental Trading, Inc.</u>, 158 F.3d 43, 47 (1st Cir. 1998). If the employer then provides a legitimate, non-retaliatory reason for the action, the employee must present "some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked his

21

dismissal." <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 262 (1st Cir. 1999).

Bone's 1998 complaint to the New Hampshire Commission for Human Rights was a protected activity. In addition, Bone's "Formal Complaint of Harassment against Bruce Paquette," which he submitted to Patricia Fisher and James Lewis on June 2, 1999, was a protected activity. Hadco's decision to terminate Bone's employment was an adverse action.

To the extent Bone argues that Paquette's actions were motivated by an effort to retaliate against him for filing the 1998 complaint, the record makes it clear that Paquette was not aware of that complaint until after Bone had been suspended. Bone's complaint against Paquette was not submitted until after Bone had been suspended, after all of Paquette's challenged actions had occurred. Therefore, none of the adverse actions attributed to Paquette could be causally related to either complaint.

The decision to terminate Bone, on June 8, 1999, was made while his 1998 complaint was pending and after he submitted his first complaint against Paquette. Bone offers nothing to link his termination with either complaint. The 1998 complaint had been pending for more than a year when the decision to terminate him was made. Bone's complaint against Paquette was submitted

22

after Bone had been suspended.  Patricia Fisher continued her investigation into the insubordination charge after Bone filed the complaint.  No reference is made to either the 1998 complaint or Bone's complaint against Paquette as grounds for his termination.

Therefore, Bone has not established a prima facie case of retaliatory termination.  Even if he could overcome that deficiency, he could not counter Hadco's reason for terminating him with significantly probative evidence that subordination was pretextual and that, instead, Hadco was motivated by retaliation to terminate him.  Hadco is entitled to summary judgment on Bone's retaliation claim.


## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 67) is granted.  The plaintiff's motions to supplement a deposition (document no. 87), to supplement amended objection (document no. 88), and to amend memorandum (document no. 98) are granted and were considered in the course of addressing the motion for summary judgment.

Since all of the plaintiff's claims against the defendant are resolved in favor of the defendant, the parties' discovery disputes are moot.  Therefore, the plaintiff's motions to

23

reconsider (documents no. 101 and 103) and the defendant's motion to dismiss (document no. 78) are denied as moot.

The clerk of court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

October 23, 2001

cc:  Elston Bone, pro se
     Jennifer A. Demaree, Esquire
     Martha Van Oot, Esquire
     Robin D. Murphy, Esquire

24