# United States Court of Appeals
## For the First Circuit

No. 18-2061

LAURA BAUM-HOLLAND; SARAH HOLLAND;
EMILY HOLLAND; JOSEPH HOLLAND,

Plaintiffs, Appellants,

v.

HILTON EL CON MANAGEMENT, LLC; HILTON EL CON OPERATOR, LLC;
LXR LUXURY RESORTS, INC.; EL CONQUISTADOR PARTNERSHIP L.P.,
S.E., d/b/a El Conquistador Resort;
ZURICH AMERICAN INSURANCE COMPANY,

Defendants, Appellees,

EL CONQUISTADOR GOLF RESORT & CASINO AND LAS CASITAS RESORT,
a Waldorf Astoria Resort; HILTON INC.; LA CASA DEL MAR, INC.;
INSURANCE COMPANY ABC; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Hatuey A. Infante-Castellanos, with whom Hatuey Infante Law
Offices, P.S.C., Freddie Pérez-González, Freddie Pérez-González &
Assoc., P.S.C., Toby B. Fullmer, and Toby B. Fullmer, L.L.C. were
on brief, for appellants.
Iván M. Fernández, with whom Law Office of Iván M. Fernández

was on brief, for appellee Zurich American Insurance Company.

Francisco E. Colón-Ramírez, with whom Colón Ramírez LLC was on brief, for appellees Hilton El Con Management, LLC, Hilton El Con Operator, LLC, and El Conquistador Partnership L.P., S.E.

———————————————

June 30, 2020

———————————————

**TORRUELLA**, **Circuit Judge**.  This diversity case arises from the unfortunate death of Dr. George Holland ("Dr. Holland") while he was vacationing at El Conquistador Resort, a hotel located in Fajardo, Puerto Rico.  Dr. Holland's wife, Laura Baum-Holland ("Baum-Holland"),[1] and their children, Sarah, Emily, and Joseph Holland (collectively "Appellants") asserted a tort claim under Article 1802 of the Puerto Rico Civil Code against El Conquistador Partnership L.P., S.E. d/b/a El Conquistador Resort; its insurer, Zurich American Insurance Company; Hilton El Con Management LLC; Hilton El Con Operator LLC (collectively "Defendants-Appellees"); and LXR Luxury Resorts,[2] stemming from Dr. Holland's death while he was snorkeling close to Palomino, an island near the hotel.[3] Defendants-Appellees moved for summary judgment, which the district court granted, dismissing the complaint.  Because we find that there is insufficient evidence in the record to establish the causation element of Appellants' tort claim, we affirm.

---

[1]  Baum-Holland is an obstetrician and gynecologist.

[2]  Although LXR Luxury Resorts is also a named defendant, it is a trademark that El Conquistador Partnership L.P., S.E. licenses from LXR Holdco, Inc., not an entity that may be sued.

[3]  The operative complaint also included Casa del Mar, Inc. as a defendant but, as we will later explain, it is not a party on appeal.

## I. Background

**A. Factual Background**

On December 26, 2012, Dr. Holland, Appellants, and some other relatives and friends arrived in Puerto Rico to celebrate a birthday and New Year's Eve. They stayed at El Conquistador Resort, a luxury hotel located on the coast of Fajardo, Puerto Rico. At the relevant time, the hotel was owned and operated by El Conquistador Partnership L.P., S.E. d/b/a El Conquistador Resort. El Conquistador Resort provides ferry transportation to a nearby island, Palomino, whose facilities are managed by the hotel.

On January 1, 2013, Dr. Holland, his family, and some friends, including Lawrence and Lisa Jassin,[4] used the hotel's transportation services to get to Palomino, where they planned to spend the day at the beach. Dr. Holland was obese and suffered from untreated hypertension.

Dr. Holland and his family rented snorkeling gear from Casa Del Mar, Inc. ("Casa del Mar"), a concession stand on Palomino Island.[5] They rented four masks and four sets of fins. Casa del Mar had signs indicating the availability of flotation belts.

---

[4]  The Jassins arrived in Puerto Rico on December 31, 2012.

[5]  The hotel shared in the profits as a result of its Concession Agreement with Casa del Mar.

-4-

That day, it had approximately eight to fifteen flotation belts that were in view to the public and available for rental for five dollars each. Dr. Holland did not rent any flotation belts. Casa del Mar rented two belts later in the day to other patrons. Other than the flotation belts, the concession stand had no other safety equipment.

Customers renting equipment from Casa del Mar were required to read and sign a release form. Dr. Holland signed the document before taking the equipment. The document stated:

Snorkeling Liability and Release Policy
(Please Read Below Carefully and Sign)

Medical History

I neither am nor have suffered from any mental and/or physical disease, illness, or disability that would render me unfit for snorkeling.

Release Liability

I fully understand that my snorkeling activity is at my own risk, and hear by [sic] release La Casa del Mar Dive Center, El Conquistador Resort, the subsidiaries, and it's [sic] employees. I also understand that I will hold them harmless from all claim, risk, damage, injury, and liability arising from any injury or illness sustained while engaged in snorkeling caused from any negligence or default of any other snorkelers.

Equipment

I hear by [sic] accept the equipment as follows: I agree that the use of such equipment is at my own risk. I shall return the equipment in good working order, the same way and complete as was received.

After renting the snorkeling equipment, Dr. Holland and his party set out to snorkel between Palomino and Palominito, a smaller island off the coast of Palomino. Dr. Holland had snorkeled before. According to Mrs. Jassin, the water was choppy, and there were strong currents that made them drift to the side, but "[they] were okay" and did not notice any conditions that would warrant them to change their plans and turn back to Palomino.[6] Dr. Holland was swimming next to Mrs. Jassin, about twelve feet to her left. At some point during the swim, Dr. Holland directed Ben -- the Jassins's son -- to swim to the island ahead of him (Palominito) to get Dr. Holland's son, Joseph. Ben was able to do as instructed. Approximately halfway through his swim, Dr. Holland stopped swimming and stared at Palominito. At that time, according to Mrs. Jassin, Dr. Holland was treading water, not thrashing, and appeared calm. He did not appear to be drowning. Mrs. Jassin asked Dr. Holland if he was okay, but he did not respond.

After noticing his unresponsiveness, the Jassins approached Dr. Holland. Mrs. Jassin had lifeguard training, and was trained in cardiopulmonary resuscitation ("CPR") and the use

_____

[6] Mrs. Jassin agreed that "there certainly wasn't anything in the water that was overcoming any swimmer and causing them to go under" and "[n]o one was getting tossed in the waves or getting thrown under water, like crashing waves."

of automated external defibrillators ("AED").  Shortly after Mrs. Jassin reached him, Dr. Holland began to foam at the mouth and slumped in the water.  The Jassins held Dr. Holland, which prevented his head from going under water, and yelled for help. Mrs. Jassin believed that Dr. Holland was having a heart attack.

Within five minutes, Edward Valentín, an employee of Palomino Water Sports,[7] arrived on a jet ski to aid Dr. Holland. Mr. Valentín had previously worked in search and rescue missions with the State Emergency Management Service in Puerto Rico and was trained in life rescue techniques.  Mr. Valentín signaled to the shore for more assistance.  At that point, John Rosado, co-owner of Palomino Water Sports, and José Caraballo, another of his employees who is also a certified lifeguard, got on a jet ski and headed towards Dr. Holland.  The group tried to get Dr. Holland on the jet ski to no avail.  At some point during their attempt, Dr. Holland's head submerged.[8]

Then, a Hobie Cat arrived with people from Dr. Holland's group,[9] and Dr. Holland was placed on it.  Once on board,

---

[7]  Palomino Water Sports is another concession stand that rents jet skis, kayaks, paddle boards, sailboats, Hobie Cats (small sailing catamarans), beach toys, and other water sport equipment.

[8]  This was the first time that anyone saw Dr. Holland's head go under water.

[9]  Baum-Holland's sister-in-law and nephew, as well as Joseph

Baum-Holland's sister-in-law, who is a physician, performed CPR on Dr. Holland.[10]  Baum-Holland's brother, Dr. Richard Baum,[11] who had heard that Dr. Holland was in trouble, approached the Hobie Cat on a jet ski and got on board.  Once on board, he also helped with the CPR, which was provided to Dr. Holland continuously until the Hobie Cat arrived at the shore of Palomino within two to ten minutes.[12]  According to Dr. Baum, Dr. Holland's pulse remained faint and his breathing shallow until he was taken back to Palomino, where Dr. Holland's respiration and pulse at some point could no longer be detected.

Once back at Palomino, Dr. Holland was laid on the sand and continued to receive CPR.  Other hotel guests assisted Dr. Holland.  Dr. Melinda Armacost -- a dentist with CPR certification -- and an ER nurse began chest compressions and mouth to mouth respiration.  While receiving CPR, Dr. Holland expelled liquid (water and "some kind of chunk content").  Dr. John Ruge,

---

Holland were on the Hobie Cat.

[10]  Baum-Holland's sister-in-law, Dr. Kathe Baum, is an interventional radiologist.

[11]  Dr. Richard Baum is also an interventional radiologist.

[12]  While Mr. Rosado testified that it took the Hobie Cat between two to three minutes to get to the shore, Mrs. Jassin testified that "[i]t seemed like forever[,] . . . maybe ten minutes, but it seemed like a long time because [they] were worried about [Dr. Holland]."

a neurosurgeon with twenty-seven years of experience, joined the group in aiding Dr. Holland shortly thereafter and performed CPR. Both Dr. Armacost and Dr. Ruge stated that, while lying on the sand, Dr. Holland was "blue," "cyanotic," "pulseless, breathless, [and] unresponsive."[13]

A hotel employee brought an AED to the scene[14] and Dr. Ruge applied it on Dr. Holland,[15] but the AED did not register a pulse from Dr. Holland.[16] Dr. Ruge also administered an epinephrine injection (EpiPen) to Dr. Holland's heart.

Dr. Holland was then placed on a stretcher and driven to the dock on a golf cart. Dr. Ruge stayed with Dr. Holland on his way to the dock. Once at the dock, Dr. Holland was transported back to Fajardo on a U.S. Department of Homeland Security boat.[17]

---

[13] Dr. Ruge thought Dr. Holland was already dead when he first saw him.

[14] The employee also brought a small oxygen tank with a mask.

[15] Dr. Armacost testified that it took around ten minutes to get the AED to Dr. Holland's location. Baum-Holland testified that it took a "long time," although she does not claim that it took more than ten minutes. This discrepancy, however, does not create an issue of material fact.

[16] Dr. Armacost did not detect a pulse on Dr. Holland either.

[17] According to Mr. Rosado, Dr. Holland was transported back to Fajardo on a Homeland Security boat instead of on the hotel ferry because the former was faster than the latter. Approximately thirty-five to forty minutes transpired between the time Dr. Holland returned to Palomino on the Hobie Cat and when he was

-9-

He continued to receive CPR during the trip back to Fajardo, where an ambulance was awaiting on shore. Dr. Holland was taken to a hospital in Fajardo, where he was pronounced dead upon arrival.

Dr. Francisco Cortés, a forensic pathologist who worked with the Puerto Rico Institute of Forensic Sciences, performed Dr. Holland's autopsy and prepared an autopsy report. The report noted that Dr. Holland was 5'10", was "obese," had an enlarged heart, enlarged and fatty liver, atherosclerosis, and presented pulmonary and sphenoid edema. The report listed Dr. Holland's cause of death as "[a]sphyxia by drowning" with "[a]rteriosclerotic coronary disease" as a "contributing factor."

During his deposition, Dr. Cortés explained the information that was available to him at the time of the autopsy, the autopsy process, and his findings. He stated that, on January 2, 2013, an employee from the Puerto Rico Institute of Forensic Sciences interviewed Baum-Holland, who provided information about Dr. Holland's medical history. According to the transcript of that interview, Baum-Holland reported that Dr. Holland had high cholesterol levels and suffered from hypertension but was not treated for either of these conditions.

_____

placed on the Homeland Security boat.

Dr. Cortés further explained that he performed Dr. Holland's autopsy on January 4, 2013. That day, Dr. Cortés filled out a form for histology testing of heart, lung, and liver tissue from Dr. Holland. In the "comment" section of that form, Dr. Cortés wrote, **"**[w]hile he was snorkeling at the beach, he suffered an infarct and died." According to Dr. Cortés, in writing that statement, he "took into consideration that [Dr. Holland] was snorkeling, . . . was obese, and . . . had untreated hypertension." Similarly, in a form he submitted requesting toxicological analysis of Dr. Holland's "blood; nasal swab; and diffused humor," Dr. Cortés identified Dr. Holland's "manner of death" as "pending" and his "class" of death as "cardiac." In this same form, Dr. Cortés wrote in the "circumstances of death" section that "[w]hile [Dr. Holland] was snorkeling at the beach, he had an infarct and died."

During his deposition, Dr. Cortés also expanded on his findings from the autopsy report. He testified that "coloration on [Dr. Holland's] face" "could be indicative of arrhythmia" or "postmortem changes." He also testified that fluid in the sphenoid sinus, such as that found during Dr. Holland's autopsy, is typically found in people who have drowned, and that Dr. Holland had to have been alive when the liquid entered his sphenoid sinuses in order for him to have "breathe[d]" in the water.

In addition, Dr. Cortés explained that the "congested mucosa" found in Dr. Holland's "epiglottis, trachea and larynx," was "evidence of a lack of oxygenation," which can be found in different infarct cases as well as some drowning cases. He also testified that "pulmonary edema" and "foaming at the mouth," both exhibited by Dr. Holland, can be found in a person who has suffered a heart failure or someone who has drowned.

Dr. Cortés also testified that Dr. Holland's "spleen [was] increased in size," his lungs were "very increased in weight," and he had a "markedly enlarged" and "fatty liver."

In explaining the autopsy report's finding regarding Dr. Holland's heart, Dr. Cortés testified that Dr. Holland's untreated "chronic hypertension" led him to have a "considerably" larger than normal heart (weighting 560 grams), which could cause arrhythmias. The heart also had "thickening of the left [blood] ventricle" and "atherosclerotic changes." In sum, Dr. Cortés characterized Dr. Holland's heart as a "sick heart."

Lastly, although in the autopsy report Dr. Cortés listed "drowning" as Dr. Holland's "cause of death" and "[a]rteriosclerotic coronary disease" as a contributing factor, Dr. Cortés clarified in his deposition that, "by drawing the conclusion of drowning, [he] did not rule out a heart attack" "preceding the aspiration of the fluid in the sinus." In fact,

when asked to comment on the opinion from a cardiologist consulted by El Conquistador to the effect that Dr. Holland suffered a heart attack prior to aspirating water and drowning,[18] Dr. Cortés responded that he could not "rule that out, because that's probably what happened."

Appellants hired Dr. Miguel Canals as an expert in oceanography. Dr. Canals wrote a report on the oceanographic conditions on January 1st and was then deposed.

At his deposition, Dr. Canals acknowledged that, on the morning of January 1, 2013, the National Weather Service ("NWS") issued a bulletin stating that "dangerous surf zone conditions" were expected for Puerto Rico and the Northern U.S. Virgin Islands. Dr. Canals testified that, although the NWS estimated that waves

---

[18] Specifically, Dr. Cortés was told that the cardiologist's opinion was as follows:

> [Dr. Holland] had a severe left ventricular hypertrophy 2.4 centimeters, normal being less than one centimeter. He went into heart failure most likely due to elevating his heart rate and blood pressure from snorkeling, and then developed diastolic dysfunction of the heart muscle, leading to pulmonary edema.
> Pulmonary edema, and foaming at the mouth, developed before he was lifted onto the catamaran, and before [the Jassins] saw any evidence of Dr. Holland's submerging below the water.
> Going into pulmonary edema certainly could affect his responsiveness and cause an ischemic response. With ischemia, or lack of blood and oxygen, he then developed a fatal arrhythmia and died.
> Hypertension, severe left ventricular hypertrophy, and exercise such as snorkeling explained his death.

were breaking in the Atlantic Ocean between ten and fourteen feet on January 1, 2013, his reconstruction of the oceanographic conditions for the area where Dr. Holland was snorkeling indicated that the waves between Palomino and Palominito were breaking at only one to two feet. Dr. Canals explained that this discrepancy was due to the Palomino area being a "sheltered environment" surrounded by reefs and islands to the north of Palomino that dissipate wave energy. He found that the conditions in the area where Dr. Holland was snorkeling were "drastically different" from the conditions described in the NWS bulletin because "the [bulletin] does not attempt to estimate the wave conditions at locations which are not exposed." The bulletin, in Dr. Canals's opinion, "is meant for all of Puerto Rico" and does not analyze or attempt to forecast the conditions at the exact location where Dr. Holland was snorkeling. Dr. Canals determined that the winds in the area where Dr. Holland was snorkeling should have been between five and twelve miles per hour, and that the current speeds near Palomino were somewhere between 0.6 to 0.9 knots.

## B. Procedural History

On November 28, 2014, Appellants filed the initial complaint. They amended their complaint three times, the last of which they filed on January 9, 2017. On December 15, 2017, Defendants-Appellees moved for summary judgment. On January 22,

-14-

2018, Appellants opposed summary judgment. Defendants-Appellees replied on February 10, 2018.[19]

On September 30, 2018, the district court issued an opinion and order granting Defendants-Appellees' motion for summary judgment in its entirety. See Baum-Holland v. El Conquistador P'ship, 336 F. Supp. 3d 6 (D.P.R. 2018). As an initial matter, the district court found that Hilton El Con Management LLC and Hilton El Con Operator LLC did not own, operate, or provide services to the hotel during the relevant time period. It also found that LXR Luxury Resorts is not an entity, but rather a trademark owned by LXR Holdco, Inc. that El Conquistador Partnership L.P., S.E. used as a licensee; and that in any event, LXR Luxury Resorts did not own, operate, or provide services to the hotel during the relevant time period. Appellants do not challenge those findings or otherwise argue that summary judgment should not have been entered as to those specific defendants. Accordingly, Appellants have waived any challenge to the dismissal of the complaint as to those defendants. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Our analysis on appeal

---

[19] Casa del Mar also filed a motion for summary judgment, which Appellants opposed. Soon thereafter, and before the district court could rule on Casa del Mar's motion, Appellants settled all their claims against Casa del Mar and the district court entered partial judgment dismissing all claims against it. Casa del Mar is not a party on appeal.

is thus limited to Appellants' claims against El Conquistador Partnership L.P., S.E. d/b/a El Conquistador Resort and its insurance company, Zurich American Insurance Company (collectively "El Conquistador").

The district court granted summary judgment in favor of El Conquistador on the grounds that Appellants had failed to meet their burden of proof as to the breach of a duty of care and causation elements of their negligence claim. The court rejected Appellants' arguments that El Conquistador breached its duty of care to Dr. Holland by failing to warn him of the allegedly dangerous sea conditions, by not providing timely and appropriate aid, and by failing to provide safety devices such as flotation belts or vests, reflective mirrors, and whistles.

As to the alleged failure to warn, the court held that Appellants did not "establish a real hazardous condition at sea" about which El Conquistador should have warned Dr. Holland. Specifically, the court found that the NWS bulletin on which Appellants relied was not probative of their claim because the evidence in the record showed that the conditions in the bulletin were not consistent with the conditions in the specific area where Dr. Holland was swimming (the stretch of water between Palomino and Palominito), which is a "sheltered environment" due to "a barrier of islands and reefs." Because foreseeability is

necessary to establish that a defendant breached its duty of care, the court concluded that Appellants' "fail[ure] to provide evidence that made foreseeable that Dr. Holland's event was bound to occur" defeated their contention that El Conquistador had breached its duty by failing to warn Dr. Holland. The court further determined that Dr. Holland knowingly endangered himself and assumed the risk when he decided to snorkel despite having knowledge of his health conditions.

Regarding the alleged breach of a duty of care by failing to provide safety devices such as flotation belts, reflective mirrors, or whistles, the court concluded that Appellants had failed to establish that El Conquistador had a duty to provide such safety devices. Furthermore, the court found that although flotation belts were available for rental at Casa del Mar, Dr. Holland chose not to rent one.

In rejecting Appellants' argument that El Conquistador breached its duty of care to Dr. Holland by failing to provide timely and appropriate aid, the court found that the immediate aid provided by Mrs. Jassin, who had lifeguard and CPR training and who was only twelve feet away from Dr. Holland, was "much more effective" than any help that could have been provided by El Conquistador or an on-duty lifeguard given that Dr. Holland was approximately 250 meters from the shore when the incident occurred.

-17-

Furthermore, the court found that Dr. Holland continuously received CPR, and that El Conquistador had an AED available, which a doctor with twenty-seven years of experience used to try to save him.

As to the element of causation, the district court held that Appellants had failed to establish causation because they did not submit evidence from which a reasonable jury could conclude that "Dr. Holland would have survived if first aid [had been] provided by El Conquistador instead of Mrs. Jassin." Furthermore, the court noted that Dr. Holland received CPR from various doctors, that an AED was also used on him by a doctor, and that Appellants had failed to present evidence that these "efforts were deficient."

Finally, the district court determined that the release form that Dr. Holland signed when he rented the snorkeling gear from Casa del Mar was enforceable and "released El Conquistador from liability regarding the snorkeling activity [Dr. Holland] was engaging in prior to his demise." Accordingly, the court concluded that the release barred Appellants' claims.

Appellants timely appealed. They challenge the dismissal of their Article 1802 tort claim on the merits as well as the district court's finding that the release form signed by Dr. Holland barred their tort claim.

## II. Discussion

### A. Standard of Review

We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The party opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020)

-19-

(quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)). "For this purpose, [it] cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" Id. (quoting Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)).

**B. Applicable Law**

Because this is a diversity case, we apply Puerto Rico's substantive law. See Suero-Algarín v. CMT Hosp. HIMA San Pablo Caguas, 957 F.3d 30, 39 (1st Cir. 2020) ("[F]ederal courts sitting in diversity apply state substantive law." (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996))). Appellants filed their suit under Article 1802 of the Puerto Rico Civil Code -- Puerto Rico's general tort statute. Article 1802 provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. It further provides that "[c]oncurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity." Id.

"Negligence under Article 1802 is generally defined as 'the failure to exercise due diligence to avoid foreseeable risks.'" Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 546-47 (1st Cir. 2019) (quoting Woods-Leber v. Hyatt Hotels

-20-

of P.R., Inc., 124 F.3d 47, 50 (1st Cir. 1997)).  To recover on a negligence-based tort claim pursuant to Article 1802, a plaintiff must establish: "(1) a duty requiring the defendant to conform to a certain standard of conduct, (2) a breach of that duty, (3) proof of damage,[20] and (4) a causal connection between the damage and the tortious conduct."  Id. at 547 (quoting Woods-Leber, 124 F.3d at 50).  Because the parties do not dispute that Appellants meet the third element of their Article 1802 claim, we focus on the remaining elements.

The first element, a "duty requiring the defendant to conform to a certain standard of conduct," is commonly known as a "duty of care."  It refers to an "obligation to anticipate and take measures against a danger that is reasonably foreseeable." Woods-Leber v. Hyatt Hotels of P.R., Inc., 951 F. Supp. 1028, 1036 (D.P.R. 1996), aff'd, Woods-Leber, 124 F.3d 47.  This duty of care may arise: (1) by statute or regulation; (2) "as the result of a special relationship between the parties that has arisen through

---

[20]  Some cases refer to this element as requiring proof of an "injury."  See, e.g., Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007); Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 321 (1st Cir. 1999) (using "injuries/damages" interchangeably).  The discrepancy is due to varying translations from Spanish of the word "daño" -- derived from the Spanish phrase, "[e]l que . . . causa daño a otro," included in the Spanish version of P.R. Laws Ann. tit. 31, § 5141. See 31 L.P.R.A. § 5141 (Spanish version).

custom; or (3) as the result of a traditionally recognized duty of care particular to the situation." De Jesús-Adorno v. Browning Ferris Indus. of P.R., Inc., 160 F.3d 839, 842 (1st Cir. 1998).

We have held that, under Puerto Rico law, hotels have a "heightened duty of care towards their guests." Blomquist, 925 F.3d at 547. In carrying out this duty of care, the hotel must act as a "prudent and reasonable person under the circumstances." Id. (quoting Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007)). However, hotels "are not absolute insurers of their guests' well-being." Id. Rather, "even where [the hotel has] a duty of care, the [c]ourt must still determine what degree of care is required by considering the foreseeability of an injury, the nature and magnitude of the injury, and what a reasonable and prudent man would ha[ve] done under the same circumstances." Woods-Leber, 951 F. Supp. at 1036.

Regarding the second element -- breach of a duty of care -- because "a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk," Vázquez-Filippetti, 504 F.3d at 49, the plaintiff needs to demonstrate that the injury was "reasonably foreseeable," Woods-Leber, 124 F.3d at 50-51. See Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 321-22 (1st Cir. 1999) (noting that "[n]ot all actions or omissions

-22-

which result in injuries/damages will give rise to liability under [A]rt. 1802"; rather, "liability will only arise if the damages complained of were reasonably foreseeable to the defendant"). This inquiry is "case-specific and fact-dependent." Blomquist, 925 F.3d at 548.

Although "the requirement of foreseeability is not limited to requiring that the precise risk or consequences" suffered by the plaintiff be foreseen, those damages "must [still] fall within the general class of consequences that in a normal person's experience flow from such an act or omission." Woods-Leber, 951 F. Supp. at 1036 (emphasis omitted) (quoting Pabón-Escabí v. Axtmayer, 90 P.R. Dec. 20, 25 (1964), then citing Brau del Toro, 1 Daños y Perjuicios Extracontractuales [Torts] 184–185).

Under the fourth element of an Article 1802 claim, a plaintiff must prove that the defendant's breach of its duty of care was the proximate cause of the damage or injury suffered. This causation analysis requires that two elements be met: (1) the defendant's breach of its duty of care must be the actual cause of the injury suffered by the plaintiff, and (2) the injury suffered must have been reasonably foreseeable to the defendant. See Vázquez-Filippetti, 504 F.3d at 49 n.6 (explaining how "[a] defendant's actions may only be the proximate cause of a

-23-

plaintiff's injuries if they in fact caused the injuries and the defendant could have reasonably foreseen that the injuries (or related harms) would result from his actions"); Tormos-Arroyo v. Dep't of Educ. of P.R., 140 P.R. Dec. 265, 275-76 (1996) (noting that for purposes of Article 1802, there is a causal relationship between an omission and an injury when the injury was reasonably foreseeable and could have been avoided had the defendant performed the omitted act). Foreseeability, in the context of causation, cannot "be established through the simple fact that an accident occurred." Vázquez-Filippetti, 504 F.3d at 53. Instead, the foreseeability inquiry in this context is one of "probabilities," and not mere "possibilities." See id. at 54. An intervening cause, defined as "a cause of injury that 'comes into active operation in producing the result after the actor's negligent act or omission has occurred,'" Widow of Andino v. P.R. Water Res. Auth., 93 P.R.R. 168, 178 (1966), can break the chain of causality if it is deemed to have been unforeseeable by the defendant. See Malavé-Félix v. Volvo Car Corp., 946 F.2d 967, 972 (1st Cir. 1991).

**C. Analysis**

To survive summary judgment, Appellants need to point to sufficient evidence in the record from which a reasonable jury

could rule in their favor as to each of the four elements of their Article 1802 claim.

Appellants argue that El Conquistador breached three different duties of care, which caused Dr. Holland's death by drowning because of the ocean conditions on January 1, 2013, and that there are several material facts in dispute as to El Conquistador's breach of those duties, which make summary judgment inappropriate.

First, Appellants argue that El Conquistador had a duty to warn Dr. Holland about the ocean conditions on January 1st, and that it breached that duty by allowing him to go in the water when, instead, it "should have prohibited . . . Dr. Holland from engaging in snorkeling or other water activities."  To support that claim, Appellants rely primarily on the NWS bulletin and Dr. Canals's expert report and deposition testimony.  According to Appellants, there are material facts in dispute about the ocean conditions, including the dangerousness of the currents, which bar summary judgment.

Second, Appellants posit that El Conquistador had a duty to aid Dr. Holland in such a moment of peril, and that it breached this duty by not having: "a lifeguard on duty," the means to quickly transport Dr. Holland to shore when he appeared to be in distress, or an AED readily available when Dr. Holland was brought

ashore to Palomino. Appellants further argue that Dr. Holland received assistance and CPR from "Good Samaritan hotel guests" rather than from hotel staff. According to Appellants, disputes over whether El Conquistador provided effective and timely assistance to Dr. Holland -- including whether Mrs. Jassin properly substituted for an on-staff lifeguard -- ought to prevent the entry of summary judgment.

Third, Appellants argue that El Conquistador also had a duty to provide safety gear, such as "flotation devices" (i.e., flotation belts and snorkeling vests), whistles, and reflective mirrors. According to Appellants, the parties dispute whether El Conquistador breached this duty, specifically whether Casa del Mar had "flotation devices available" on January 1st and whether Dr. Holland "decided not to rent them."

In response, El Conquistador disputes that it either had any of these three duties of care or that it breached them. Furthermore, El Conquistador argues that, even assuming it had these duties of care and that Appellants could prove breach, summary judgment is nevertheless still appropriate because Appellants cannot prove causation.

Regarding the alleged duty to warn, El Conquistador first disputes the admissibility of both the NWS bulletin and Dr. Canals's expert report. It argues that the NWS bulletin was

not properly authenticated and that Dr. Canals's expert report was "unsworn"; and therefore, both constitute inadmissible hearsay evidence, which cannot be used to support Appellants' claim that El Conquistador breached an alleged duty to warn. In the alternative, El Conquistador argues that, even if admissible, neither the NWS bulletin nor Dr. Canals's expert report support Appellants' contention that it had a duty to warn Dr. Holland of dangerous ocean conditions or that it breached such a duty. Specifically, El Conquistador argues that the NWS bulletin is not evidence that it was "put [] on notice" of dangerous conditions in the area where Dr. Holland was snorkeling, between Palomino and Palominito, because, as admitted by Appellants' own expert, Dr. Canals, the bulletin applied to a "completely different location[]." Appellees' Brief at 38. It argues that the evidence in the record (including Dr. Canals's expert report and his deposition testimony) shows that the conditions in the area between Palomino and Palominito were, in Dr. Canals's words, "drastically different" than those reported in the bulletin because that area is surrounded by islands and reefs that create a sheltered environment that reduces wave energy. It further argues that, according to the evidence in the record, there were only "one to two-foot waves" in the area where Dr. Holland was snorkeling, and the winds were blowing at typical trade wind speeds. Finally,

El Conquistador posits that both the duty-of-care and breach-of-duty elements require that the danger alleged by the plaintiff be reasonably foreseeable, but here, a drowning event was not foreseeable because it was not likely to occur. In support of that contention, El Conquistador argues that over one million El Conquistador guests visited Palomino between 2008 and 2012 and none of them drowned.

Concerning the alleged duty to aid, El Conquistador argues that Appellants have failed to prove that it had a "legal duty to provide lifeguards" or "rescue boats at Palomino," and that El Conquistador provided Dr. Holland with an AED within "several minutes" of the incident, and an experienced neurosurgeon used the device on Dr. Holland.

El Conquistador also refutes Appellants' contention that it breached a duty to provide safety gear. First, it denies having such a duty, arguing that no "rule, law, regulation or standard" requires that it provide either flotation devices or "distress signaling devices" such as reflective mirrors or whistles. In support of its contention, El Conquistador points to the deposition testimony of Appellants' "own liability expert," Alberto Martí, a certified scuba diver who owns a concession stand that rents out snorkeling gear in San Juan, Puerto Rico. Mr. Martí testified that the use of flotation devices for snorkeling is optional and

people often do not rent them, and that nothing requires a concession stand that rents snorkeling equipment to provide a reflective mirror or a whistle to alert others in the event of distress. Second, El Conquistador argues that, even assuming it had a duty to provide flotation devices to snorkelers, it did not breach that duty because Casa del Mar had between eight and fifteen flotation belts available for rental when Dr. Holland got his snorkeling equipment on January 1st. El Conquistador emphasizes that, although aware that he could rent a flotation belt for only five dollars, Dr. Holland still opted not to rent one.

Lastly, El Conquistador argues that Appellants cannot prove the causation element required to survive summary judgment. According to El Conquistador, Appellants have not pointed to any evidence in the record establishing that "Dr. Holland more likely than not perished because [El Conquistador] breached any standard of care." It argues that the evidence shows that Dr. Holland "probably" died because of a cardiorespiratory event that occurred while he was in the water, due to an untreated heart condition. Following this reasoning, El Conquistador insists that Dr. Holland would have died due to his underlying health conditions even if he had been wearing a flotation device because the evidence shows that Dr. Holland started foaming at the mouth even before his head ever submerged. El Conquistador further argues that there is no

proximate causation between El Conquistador's alleged breach of the duty to aid and Dr. Holland's death because third parties trained in the medical field and in life-saving techniques were indisputably available "quickly" to aid Dr. Holland as soon as he became unresponsive, to transport him to Palomino, and to provide CPR and other assistance, yet, witnesses testified that he either was already dead or died shortly after being brought ashore. According to El Conquistador, this shows that having a rescue boat or an on-duty lifeguard available would not have altered the outcome and that no evidence in the record suggests otherwise. It further argues that Appellants have offered no evidence to show that, "more likely than not," providing an AED sooner would have saved Dr. Holland's life.

To survive summary judgment, Appellants need to point to sufficient evidence in the record that would allow a reasonable jury to rule in their favor as to each of the four elements of an Article 1802 claim. The parties do not dispute that the third element is met: a damage or injury. Yet, as discussed above, the parties vehemently dispute the first two elements, whether El Conquistador had any one of the three alleged duties of care, and if it did, whether it breached them, as well as the fourth element, causation.

"[W]hether a duty exists is typically a legal question for the court." Candelario del Moral v. UBS Fin. Servs. Inc. of P.R., 699 F.3d 93, 100 (1st Cir. 2012) (citing Restatement (Second) of Torts § 328B (noting that the court decides both "whether [the] facts give rise to any legal duty on the part of the defendant" and "the standard of conduct required of the defendant by his legal duty")). Breach of duty, however, "involv[es] fluid concepts like reasonableness and foreseeability" and thus "is usually an issue for a factfinder." Id. "An exception exists where a reasonable jury could only decide the breach-of-duty issue one way, in which case a judge can resolve the matter on summary judgment." Id. Here, we need not decide whether under Puerto Rico law El Conquistador had the duties of care alleged by Appellants or, if it indeed had those duties, whether there are genuine issues of material facts regarding the alleged breach of those duties that should be resolved at trial. That is so because, even assuming that both issues are resolved in Appellants' favor, Appellants have not pointed to evidence in the record from which a reasonable jury could rule in their favor as to the causation element.

First, regarding the duty to aid and to provide safety devices, we have carefully examined the extensive record and have found no evidence from which a reasonable jury could conclude that

if El Conquistador had provided an on-duty lifeguard,[21] hotel transportation to bring Dr. Holland back to Palomino when he became unresponsive while in the water,[22] whistles and reflective mirrors,[23] and snorkeling vests (as opposed to flotation vests, which undisputably were available to rent for five dollars),[24] it is more likely than not that Dr. Holland would have survived. Nor have we found evidence in the record from which a reasonable jury could find that it is more likely than not that Dr. Holland would have survived if the hotel employees had brought the AED to Dr. Holland sooner, see Room v. Caribe Hilton Hotel, 659 F.2d 5

---

[21] Remember that Dr. Holland was first aided by Mrs. Jassin, who was only twelve feet away from Dr. Holland at the time of the incident, and who was a certified lifeguard trained in CPR and AED techniques.

[22] Instead of being transported in the Hobie Cat, which was sailed by members of Dr. Holland's party.

[23] Undisputed evidence shows that Mrs. Jassin was swimming approximately twelve feet away from Dr. Holland when she noticed that he was treading water and became unresponsive. There is no evidence that Dr. Holland yelled for help or otherwise seemed in distress or that he would have used reflective devices or whistles. Nor is there evidence suggesting that these devices would have resulted in a faster response.

[24] Although Appellants argue in a conclusory manner that there is a dispute regarding whether flotation belts were indeed available for rental, they have not pointed to anything in the record to dispute El Conquistador's well-supported statement that Casa del Mar had approximately eight to fifteen flotation belts available for rental when Dr. Holland got his snorkeling equipment and that two of those belts were rented later in the day to other patrons.

-32-

(1st Cir. 1981) (requiring affirmative evidence that a delay to treat a heart attack caused additional injury), if he had been taken to the hospital sooner, see id., or if Dr. Holland had received assistance exclusively from hotel staff rather than from other hotel guests experienced in the medical field or with life-saving training.[25]  In fact, when confronted with this lack of evidence at oral argument, Appellants conceded that this evidence was not in the record before us[26] and that they did not know whether the result would have been any different had El Conquistador done everything that Appellants claim it should have done.  Because Appellants cannot point to any evidence in the record from which a reasonable jury could conclude that, more likely than not, Dr. Holland would have survived had El Conquistador not breached its alleged duties to aid and to provide safety devices, they have failed to establish causation with respect to these claims.

---

[25]  The evidence establishes that Dr. Holland quickly lost his pulse on shore, and the AED would not have functioned without a pulse.  Further, two doctors and a nurse attended to Dr. Holland.  He had epinephrine administered to his heart, and he was continuously receiving CPR.

[26]  Appellants stated that they intended to bring that evidence at trial.  Of course, that is too late.  See Ricci v. Alt. Energy, Inc., 211 F.3d 157, 161-62 (1st Cir. 2000) (explaining that if the evidence in the summary judgment record is not enough to make an issue upon which the jury may reasonably differ as to whether the defendant's conduct caused plaintiff's injury, summary judgment is appropriate).

See Tormos-Arroyo, 140 P.R. Dec. 265 (noting that, under Article 1802, a finding of causation requires that the injury be reasonably foreseeable and that it could have been avoided had the defendant performed the omitted act).

Second, the parties also dispute the causation element of Appellants' duty-to-warn claim. Principally, they offer two competing theories about Dr. Holland's cause of death. Appellants argue that El Conquistador's alleged breach of its duty to warn caused Dr. Holland to drown because of strong ocean currents. In contrast, El Conquistador contends that Dr. Holland did not die of drowning because of the ocean conditions but rather because he had a heart attack due to his untreated heart conditions. It further argues that this cardiac event was unforeseeable to El Conquistador, especially because Dr. Holland had filled out a form from Casa del Mar in which he stated that he did not suffer from any "physical disease, illness, or disability that would render [him] unfit for snorkeling." According to Appellants, this dispute as to what caused Dr. Holland's death -- drowning because of the ocean currents or a heart attack -- is a question for the jury and, thus, summary judgment is inappropriate. We disagree.

"It is the role of the judge on summary judgment to determine whether a particular inference is reasonable." Ricci v. Alt. Energy, Inc., 211 F.3d 157, 161 (1st Cir. 2000). "Judgment

-34-

about whether an inference is reasonable is different from a 'judge superimpos[ing] his own ideas of probability and likelihood (no matter how reasonable those ideas may be).'" Id. (alteration in original) (quoting Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). "In fact, for negligence cases, . . . [i]t is the function of the court to determine . . . whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." Id. at 161-62 (third alteration in original) (quoting Restatement (Second) of Torts § 434(1)(a)). Because a tort plaintiff has the burden of showing that it was more likely than not that the defendant's negligence caused the harm, "[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced," summary judgment is appropriate. Id. at 162 (emphasis in original) (quoting Restatement (Second) of Torts § 433B cmt. a).

Under Puerto Rico law, not everything that causes an injury satisfies the causation element of an Article 1802 claim. Rather, "[a] defendant's actions may only be the proximate cause of a plaintiff's injuries if they in fact caused the injuries and the defendant could have reasonably foreseen that the injuries (or

-35-

related harms) would result from his actions." Vázquez-Filippetti, 504 F.3d at 49 n.6; see also Estremera v. Inmobiliaria Rac, Inc., 9 P.R. Offic. Trans. 1150, 1156 (1980) (finding causation element not met because mugging in a dark hallway was not a foreseeable risk from a lack of lighting). Appellants did not argue below or in their opening brief that a heart attack was a foreseeable consequence of failing to warn of ocean currents. Accordingly, any argument to that effect is waived. See P.R. Tel. Co. v. T-Mobile P.R., 678 F.3d 49, 58 n.5 (1st Cir. 2012).[27] Therefore, Appellants can only defeat summary judgment if the evidence in the record is sufficient to allow a reasonable jury to conclude that, more likely than not, Dr. Holland drowned because of strong currents and not because of a cardiac event due to an underlying medical condition. See Ricci, 211 F.3d at 161-62 (finding "evenly matched" probabilities warrant granting a motion

---

[27] Appellants argued for the first time in their reply brief, and without any citation to the record, that "assuming that Dr. Holland died of a heart attack, . . . a cardiac event . . . was due to the strong currents and to the hotel's negligence in allowing Dr. Holland to go swimming that day and/or its failure to warn about the weather conditions." They further stated that they had deposed Dr. Manuel Quiles, a cardiologist, and that, although Dr. Quiles's deposition transcript was not included in the summary judgment record, Appellants intended to have him testify at trial in support of their position that Dr. Holland did not suffer "an infarct." Yet, as we stated in P.R. Tel. Co., an "argument [ ] raised for the first time on appeal without citation to any pertinent authority . . . is both inadequately presented and waived". 678 F.3d at 58 n.5.

for summary judgment).  We do not think the evidence allows a jury to make that conclusion.

Here, the evidence establishes that Dr. Holland had several medical conditions for which he was not being treated.  He suffered from obesity and, according to his forensic pathologist, had a "sick" and "considerably" enlarged heart, which can cause arrhythmias.  Dr. Holland also had untreated hypertension, atherosclerosis, plaque, and a thickened blood ventricle.  Although Appellants rely on the pathology report prepared by Dr. Cortés -- the forensic pathologist who performed Dr. Holland's autopsy -- as evidence that Dr. Holland's death was caused by drowning and not by a cardiac event, when asked to explain his findings at his deposition, Dr. Cortés stated that a heart attack was "probably" the precipitating cause for drowning.  Furthermore, according to Mrs. Jassin's deposition testimony, Dr. Holland did not look like he was drowning, and she thought he was having a heart attack.  In addition, although Dr. Cortés testified that water found in Dr. Holland's sphenoid sinus was consistent with drowning, he could not determine at what point Dr. Holland aspirated that water.  The evidence in the record, however, shows that Dr. Holland aspirated water during his rescue attempt, after he was seen foaming at the mouth, and there is no evidence that his head had submerged under water before he started foaming at

the mouth and before the Jassins aided him.  Thus, any conclusion that Dr. Holland aspirated water before he started foaming at the mouth would be mere speculation.[28]  See Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 869 (1st Cir. 1998) (rejecting speculation as a basis for denying summary judgment).

We thus conclude that, based on the record before us, Appellants have not met their burden of showing that it is more likely than not that El Conquistador's alleged failure to warn Dr. Holland of the ocean conditions caused Dr. Holland's death by drowning.  See Ricci, 211 F.3d at 162 (explaining that "[a] mere possibility [that the defendant's alleged negligence caused the injury] is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced," summary judgment is appropriate (emphasis in original) (quoting Restatement (Second) of Torts § 433B cmt. a)).  Accordingly, Appellants are not entitled to try their claim at trial and summary judgment was appropriate.[29]

---

[28]  This conclusion is also relevant to Dr. Cortés's testimony that "pulmonary edema" and "foaming at the mouth," both of which Dr. Holland exhibited, are symptoms commonly observed in someone who has suffered a heart failure as well as someone who has drowned.  Since there is no evidence that Dr. Holland's head was submerged in the water before he was seen foaming at the mouth, Dr. Cortés's testimony does not support Appellants' contention that it was more likely than not that Dr. Holland's death was caused by the ocean currents rather than by a cardiac event.

[29]  We note that Appellants also challenge the district court's

## III.  Conclusion

For the foregoing reasons, we affirm the district court's order.

**Affirmed.**

---

finding that the release form signed by Dr. Holland when he rented the snorkeling equipment from Casa del Mar also barred their Article 1802 claim. However, our conclusion that there is insufficient evidence in the record from which a reasonable jury can rule in Appellants' favor on the merits of their Article 1802 claim makes it unnecessary to further address this additional argument. See Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 56 n.16 (1st Cir. 2019) (declining to address additional arguments advanced by appellant because his appeal failed on other grounds).